ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
JOHN J. PRAGER (State Bar No. 289610)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> TRICAL, INC., DEAN C. STORKAN and JOHN IVANCOVICH, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act" or "the Act") against TRICAL, INC., DEAN C. STORKAN and JOHN IVANCOVICH, (hereafter "Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

The relief requested is authorized pursuant to 28 U.S.C. § 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration), 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d), 1365(a) (civil penalties).

2.      On or about October 29, 2014, Plaintiff provided notice of Defendants' violations of the Act ("CWA Notice Letter"), and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since this CWA Notice Letter was served on Defendants and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.  Pursuant to Local Rule 3-2(e), intra-district venue is proper in San Jose, California because the sources of the violations are located within San Benito County.

## II.      INTRODUCTION

5.      This Complaint seeks relief for Defendants' discharges of pollutants from an approximately 13-acre chemical manufacturing facility owned and/or operated by Defendants (the "Facility").  The Facility is located at 8770 Hwy 25, in Hollister, California. Defendants' discharge pollutant-contaminated storm water from the Facility to natural and

COMPLAINT

constructed channels, which convey that storm water to Carnadero Creek, the Pajaro River and ultimately into Monterey Bay.

6.      Defendants' discharges of pollutant-contaminated storm water from the Facility is in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit"). Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.      The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of these receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to Carnadero Creek, the Pajaro River and Monterey Bay.

## III.   **PARTIES**

8.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including Carnadero Creek, the Pajaro River and Monterey Bay.  CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the waters of Carnadero Creek, the Pajaro River and/or Monterey Bay, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, sail, boat, kayak, swim, birdwatch, view wildlife or engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

10.      Plaintiff is informed and believes, and thereupon alleges that TRICAL, INC., is a corporation organized under the laws of the State of California, and that Defendants own and/or operate the Facility.

11.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.      STATUTORY BACKGROUND

12.      Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.      Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm

COMPLAINT

water dischargers.  33 U.S.C. § 1342.

14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

15.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

17.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing dischargers to file their NOIs before March 30, 1992.

18.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in its storm water discharges through implementation of the Best

COMPLAINT

Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).

19.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil and Grease – 15 mg/L.  The State Water Quality Control Board has proposed adding a benchmark level for specific conductance of 200 μmhos/cm.

20.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") before October 1, 1992.  The SWPPP must comply with the BAT and BCT standards.  (Section B(3)).  The SWPPP must include, among other elements: (1) a narrative description and summary of all industrial activity, potential sources of pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm water conveyance system, associated points of discharge, direction of flow, areas of industrial activities, and areas of actual and potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4) the location where Significant Materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (6) a summary of storm water sampling points; (7) a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); (8) a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; (9) a description of significant spills and leaks; (10) a list of all non-storm water discharges and their sources, and (11) a description

of locations where soil erosion may occur (Section A(6)).  The SWPPP must also include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).

21.     The SWPPP must be re-evaluated annually to ensure effectiveness and must be revised where necessary (Section A(9),(10)).  Section  C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

22.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

23.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

COMPLAINT

24.     The General Permit also requires dischargers to submit yearly "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

25.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

26.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

27.     A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

28.     "Navigable waters" means "the waters of the United States."  33 U.S.C.

§ 1362(7).  Waters of the United States include tributaries to waters that are navigable in fact.   Waters of the United States include man-made water bodies that are tributary to waters that are navigable in fact.  Waters of the United States include ephemeral waters that are tributary to waters that are navigable in fact.

29.  Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

30.  The Regional Board has established water quality standards for the Pajaro River and Monterey Bay in the Water Quality Control Plan for the Central Coast Basin, generally referred to as the "Basin Plan."

31.  The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."

32.  The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."

33.  The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."

## V.   STATEMENT OF FACTS

34.  The Facility is classified as conforming to Standard Industrial Classification ("SIC") Codes 2879 ("Nitrogenous and Phosphatic Basic Fertilizers, Mixed Fertilizer, Pesticides, and Other Agricultural Chemicals").  Industrial activities occur throughout the Facility.

COMPLAINT

35.     The Facility is used to manufacture soil fumigant chemicals. The Facility is also used to process and store scrap metal, and to store process waste engine fluids. Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other basic storm water control measures.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

36.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

37.     Vehicle traffic at the Facility tracks dust and particulate matter, increasing the discharges of polluted water into waters of the United States.

38.     During rain events storm water laden with pollutants discharges from the Facility to Carnadero Creek, the Pajaro River and ultimately into Monterey Bay.

39.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

40.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

41.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

COMPLAINT

42.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

43.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

44.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## V.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
#### Discharges of Contaminated Storm Water from the Facility
#### in Violation of Permit Conditions and the Act
#### (Violations of 33 U.S.C. §§ 1311(a), 1342)

45.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

46.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

47.     Plaintiff is informed and believes, and thereupon alleges, that since at least October 1, 1992, Defendants have been discharging polluted storm water from the Facility into Carnadero Creek, the Pajaro River and Monterey Bay in violation of the General Permit.

48.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the

COMPLAINT

11

Facility to Carnadero Creek, the Pajaro River and Monterey Bay.

49.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

50.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

51.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

52.     Plaintiff is informed and believes, and thereupon alleges, that every day since March 30, 1992, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

53.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

54.     Section A and Provision E of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

55.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for

COMPLAINT

12

the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

56.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.

57.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

58.     Defendants have been in violation of the SWPPP requirement every day since October 1, 1992.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

59.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

60.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

61.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of Total Suspended Solids, Oil and Grease, Specific Conductance, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

COMPLAINT

62.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

63.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least October 29, 2009.  Defendants continue to be in violation of the BAT and BCT requirements each day that they fail to develop and fully implement BMPs meeting the BAT and BCT standards.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate**
**Monitoring and Reporting Program for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

66.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities, and their failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

67.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the

COMPLAINT

1   General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C.   §

2   1311(a).  These violations are ongoing and continuous.

3          WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

4   **VI.**   **RELIEF REQUESTED**

5          Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

6          a.   Declare Defendants to have violated and to be in violation of the Act, as

7   alleged herein;

8          b.   Enjoin Defendants from discharging pollutants from the Facility and to the

9   surface waters surrounding and downstream from the Facility;

10         c.   Enjoin Defendants from further violating the substantive and procedural

11  requirements of the General Permit;

12         d.   Order Defendants to pay civil penalties of $37,500 per day per violation,

13  for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§

14  1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202) (Dec. 31, 1996);

15         e.   Order Defendants to take appropriate actions to restore the quality of

16  navigable waters impaired by their activities;

17         f.   Award Plaintiff's costs (including reasonable attorney, witness, and

18  consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

19         g.   Award any such other and further relief as this Court may deem appropriate.

20

21  Dated: January 7, 2015          Respectfully Submitted,

22                                  LAW OFFICES OF ANDREW L. PACKARD

23                                  By:    /s/ Andrew L. Packard _____
                                    Andrew L. Packard
24                                  Attorneys for Plaintiff
                                    CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
25

26

27

28

COMPLAINT

15

**EXHIBIT A**



October 29, 2014

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Trical, Inc.                                          John Ivancovich, Safety Manager
P.O. Box 1327                                    Trical, Inc.
Hollister, CA 95024                          8770 Hwy 25
                                                            Hollister, CA 95024

Dean C. Storkan, President and
Registered Agent for Service of Process      Trical Soil Fumigation
Trical, Inc.                                          8770 Hwy 25
8770 Hwy 25                                      Hollister, CA 95024
Hollister, CA 95024


**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
           Pollution Control Act**

Dear Mr. Storkan and Mr. Ivancovich:

       I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Trical,
Inc.'s ("Trical") facility located at 8770 Highway 25 in Hollister, California, 95024 ("the
Facility"). The WDID number for the Facility is 3 35I000345. CSPA is a non-profit
public benefit corporation dedicated to the preservation, protection and defense of the
environment, wildlife and natural resources of California waters, including Carnadero
Creek, the Pajaro River, and the Monterey Bay. This letter is being sent to you as the
responsible owners, officers, or operators of the Facility. Unless otherwise noted, Trical,
Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation shall hereinafter be
collectively referred to as "Trical".

       This letter addresses Trical's unlawful discharges of pollutants from the Facility
to natural and constructed channels, which convey that storm water to Carnadero Creek,
which flows to the Pajaro River, which ultimately flows into Monterey Bay. Trical is in
ongoing violation of the substantive and procedural requirements of the Clean Water Act,

Notice of Violation and Intent To File Suit
October 29, 2014
Page 2 of 19

33 U.S.C. § 1251 *et seq*., and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").   Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur. *See*  40 C.F.R. § 135.2.

        As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation are hereby placed on formal notice by CSPA, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

## I.    Background.

### A.  The Clean Water Act.

        Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ."  40 C.F.R. § 122.30(a).

        The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).  A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters.  U.S.C. § 1362(7); 33 C.F.R. § 328.333 (a)(1)-(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States.  *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

CSPA is informed and believes, and thereupon alleges, that Trical has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the General Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since at least March 4, 1992.  Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trical is subject to penalties for violations of the Act since October 29, 2009.

### B.  Trical Facility, Water Quality Standards, and EPA Benchmarks

The Facility is located at 8770 Highway 25 in the city of Hollister and discharges indirectly to the Pajaro River.  The Facility falls under Standard Industrial Classification ("SIC") Code 2879 ("Nitrogenous and Phosphatic Basic Fertilizers, Mixed Fertilizer, Pesticides, and Other Agricultural Chemicals").  Accordingly Trical must analyze storm water samples for total suspended solids ("TSS"), pH, Specific Conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), in addition to Iron, Nitrate and Nitrite Nitrogen, Lead, Zinc, and Phosphorous. *See* General Permit, Section B(5)(c)(i) - (iii) and at Table D, Sections M and N.  Trical submitted a Notice of Intent ("NOI") to discharge under the General Permit in 1992.  CSPA's investigations into the industrial activities at Trical's approximately thirteen-acre Facility indicate that the Facility is used to manufacture, handle, and store soil fumigant chemicals.  The Facility is also used to process and store scrap metal.  Furthermore, the Facility is used to store and process waste engine fluids, and shop solvents.  Trical collects and discharges storm water from the Facility through at least five (5) discharge points into natural and constructed channels, which convey that storm water to Carnadero Creek, which flows to the Pajaro River, which ultimately flows into Monterey Bay.  The Pajaro River and Monterey Bay are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for the Pajaro River and Monterey Bay in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan").  The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of water quality characteristics for ocean waters to ensure the reasonable protection of beneficial uses and the prevention of nuisance.  The discharge of waste shall not cause violation of these objectives." *Id*. at 4.  The Ocean Plan limits the concentration of organic materials in marine sediment to levels that would not degrade marine life. *Id*. at 6.  The Basin Plan establishes ocean water quality objectives, including that dissolved oxygen is not to be less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.  It also establishes that toxic metal concentrations in marine habitats shall not exceed: Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L. *Id.* at III-12.

Notice of Violation and Intent To File Suit
October 29, 2014
Page 4 of 19

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L.  *Id*. at III-7.  The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L.

The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L, and for zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.38**.**  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); and lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration), subject to water hardness.

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  Discharges of pollutants into a surface water body may be deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT")

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_ report.shtml.

and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Trical: Total Suspended Solids – 100 mg/L; oil & grease – 15.0 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance of 200 µmhos/cm and total organic carbon – 110 mg/L.  Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to: pH – 6.0 – 9.0 s.u, Iron – 1.0 mg/L, Nitrate + Nitrite Nitrogen – 0.68 mg/L, Lead – 1.0 mg/L, Zinc – 0.117 mg/L (Hardness dependent), Phosphorous – 2.0 mg/L.

## II.     Trical's Violations of the General Permit.

Based on its review of available public documents, CSPA is informed and believes that Trical is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

### A.     Trical Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).

The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality

standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Trical has discharged and continues to discharge storm water with unacceptable levels of Total Suspended Solids, Specific Conductance, and Oil and Grease in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Trical's Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

1. **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 5/10/2010 | A | TSS | 168 mg/L | 100 mg/l |
| 5/10/2010 | B | TSS | 109 mg/L | 100 mg/l |
| 5/10/2010 | C | TSS | 262 mg/L | 100 mg/l |
| 5/10/2010 | D | TSS | 228 mg/L | 100 mg/l |
| 5/25/2010 | B | TSS | 266 mg/L | 100 mg/l |
| 3/24/2011 | A | TSS | 416 mg/L | 100 mg/l |
| 3/24/2011 | B | TSS | 392 mg/L | 100 mg/l |
| 3/24/2011 | C | TSS | 613 mg/L | 100 mg/l |
| 3/24/2011 | D | TSS | 344 mg/L | 100 mg/l |
| 1/20/2012 | A | TSS | 304 mg/L | 100 mg/L |

Notice of Violation and Intent To File Suit
October 29, 2014
Page 7 of 19

| 1/20/2012 | B | TSS | 304 mg/L | 100 mg/L |
| 1/20/2012 | C | TSS | 266 mg/L | 100 mg/L |
| 2/29/2012 | A | TSS | 244 mg/L | 100 mg/L |
| 2/29/2012 | B | TSS | 395 mg/L | 100 mg/L |
| 2/29/2012 | C | TSS | 101 mg/L | 100 mg/L |
| 2/29/2012 | D | TSS | 244 mg/L | 100 mg/L |
| 10/10/2012 | A | TSS | 910 mg/L | 100 mg/L |
| 10/10/2012 | B | TSS | 2414 mg/L | 100 mg/L |
| 10/10/2012 | C | TSS | 1514 mg/L | 100 mg/L |
| 10/10/2012 | D | TSS | 1222 mg/L | 100 mg/L |
| 11/28/2012 | A | TSS | 388 mg/L | 100 mg/L |
| 11/28/2012 | B | TSS | 314 mg/L | 100 mg/L |
| 11/28/2012 | C | TSS | 275 mg/L | 100 mg/L |
| 11/28/2012 | D | TSS | 604 mg/L | 100 mg/L |
| 2/06/2014 | A | TSS | 593 mg/L | 100 mg/L |
| 2/06/2014 | B | TSS | 922 mg/L | 100 mg/L |
| 2/06/2014 | C | TSS | 632 mg/L | 100 mg/L |
| 2/06/2014 | D | TSS | 1068 mg/L | 100 mg/L |
| 2/06/2014 | E | TSS | 1136 mg/L | 100 mg/L |
| 2/26/2014 | A | TSS | 2410 mg/L | 100 mg/L |

Notice of Violation and Intent To File Suit
October 29, 2014
Page 8 of 19

| 2/26/2014 | B | TSS | 572 mg/L | 100 mg/L |
|---|---|---|---|---|
| 2/26/2014 | C | TSS | 2366 mg/L | 100 mg/L |
| 2/26/2014 | D | TSS | 6574 mg/L | 100 mg/L |
| 2/26/2014 | E | TSS | 1346 mg/L | 100 mg/L |

**2.     Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 5/10/2010 | A | SC | 566 μmhos/cm | 200 μmhos/cm |
| 5/10/2010 | B | SC | 295 μmhos/cm | 200 μmhos/cm |
| 5/10/2010 | A | SC | 845 μmhos/cm | 200 μmhos/cm |
| 5/10/2010 | D | SC | 2710 μmhos/cm | 200 μmhos/cm |
| 5/25/2010 | B | SC | 994 μmhos/cm | 200 μmhos/cm |
| 3/24/2011 | A | SC | 665 μmhos/cm | 200 μmhos/cm |
| 3/24/2011 | C | SC | 404 μmhos/cm | 200 μmhos/cm |
| 3/24/2011 | D | SC | 372 μmhos/cm | 200 μmhos/cm |
| 1/20/2012 | A | SC | 609 μmhos/cm | 200 μmhos/cm |
| 1/20/2012 | B | SC | 345 μmhos/cm | 200 μmhos/cm |
| 1/20/2012 | C | SC | 850 μmhos/cm | 200 μmhos/cm |
| 2/29/2012 | A | SC | 525 μmhos/cm | 200 μmhos/cm |
| 2/29/2012 | B | SC | 264 μmhos/cm | 200 μmhos/cm |

Notice of Violation and Intent To File Suit
October 29, 2014
Page 9 of 19

| 2/29/2012 | C | SC | 8838 µmhos/cm | 200 µmhos/cm |
| 2/29/2012 | D | SC | 1597 µmhos/cm | 200 µmhos/cm |
| 10/10/2012 | A | SC | 641 µmhos/cm | 200 µmhos/cm |
| 10/10/2012 | B | SC | 704 µmhos/cm | 200 µmhos/cm |
| 10/10/2012 | C | SC | 383 µmhos/cm | 200 µmhos/cm |
| 10/10/2012 | D | SC | 1068 µmhos/cm | 200 µmhos/cm |
| 11/28/2012 | A | SC | 737 µmhos/cm | 200 µmhos/cm |
| 11/28/2012 | C | SC | 638 µmhos/cm | 200 µmhos/cm |
| 11/28/2012 | D | SC | 489 µmhos/cm | 200 µmhos/cm |
| 2/06/2014 | A | SC | 489 µmhos/cm | 200 µmhos/cm |
| 2/06/2014 | C | SC | 345 µmhos/cm | 200 µmhos/cm |
| 2/06/2014 | D | SC | 417 µmhos/cm | 200 µmhos/cm |
| 2/06/2014 | E | SC | 517 µmhos/cm | 200 µmhos/cm |
| 2/26/2014 | A | SC | 764 µmhos/cm | 200 µmhos/cm |
| 2/26/2014 | B | SC | 642 µmhos/cm | 200 µmhos/cm |
| 2/26/2014 | C | SC | 682 µmhos/cm | 200 µmhos/cm |
| 2/26/2014 | D | SC | 1241 µmhos/cm | 200 µmhos/cm |
| 2/26/2014 | D | SC | 1026 µmhos/cm | 200 µmhos/cm |

Notice of Violation and Intent To File Suit
October 29, 2014
Page 10 of 19

    **3.**    **Discharge of Storm Water Containing Oil and Grease (O&G) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/29/2012 | C | O&G | 15.1 mg/L | 15 mg/l |
| 10/10/2012 | B | O&G | 16.1 mg/L | 15 mg/l |
| 10/10/2012 | C | O&G | 37.1 mg/L | 15 mg/l |
| 11/28/2012 | D | O&G | 15.7 mg/L | 15 mg/l |
| 2/06/2014 | D | O&G | 30.9 mg/L | 15 mg/l |
| 2/06/2014 | E | O&G | 27.9 mg/L | 15 mg/l |
| 2/26/2014 | C | O&G | 26.4 mg/L | 15 mg/l |

The above samples demonstrate violations of Effluent Limitation B(3). CSPA's investigations, including a review of Trical's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark level for Specific Conductivity, indicates that Trical has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Specific Conductance, and Oil and Grease in violation of Effluent Limitation B(3) of the General Permit.  Trical was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations.  Thus, Trical is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The above samples may also constitute violations of Receiving Water Limitation C(2) of the General Permit, with respect to the discharge of parameters for which Trical has failed to undertake testing and which cause or contribute to an exceedance of applicable water quality standards, including CTR limits.  The above samples also establish violations of Receiving Water Limitation C(1) of the General Permit, because such discharges adversely impact human health or the environment, and Discharge Prohibition A (2) because the discharges cause or threaten to cause pollution, contamination or nuisance.

CSPA is informed and believes that Trical has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria

since at least October 29, 2009.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since October 29, 2009, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Trical has discharged storm water containing impermissible levels of Total Suspended Solids, Specific Conductance, Oil and Grease in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trical is subject to penalties for violations of the General Permit and the Act since October 29, 2009.

**B.**     **Trical Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the General Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on their investigations, CSPA is informed and believes that Trical has failed to develop and implement an adequate Monitoring & Reporting Plan.  As an initial matter, based on its review of publicly available documents, CSPA is informed and believes that Trical has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during at least three of the past five Wet Seasons.  Second, based on their review of publicly available documents, CSPA is informed and believes that Trical has failed to conduct the monthly visual

monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past five Wet Seasons.

Moreover, Trical has failed to analyze storm water samples for all required constituents. As a facility enrolled under SIC Code 2879 Trical must also analyze samples for Iron, Nitrate and Nitrite Nitrogen, Lead, Zinc, and Phosphorous. *See* General Permit, Section B(5)(c)(iii) and Table D, Section N.  It has failed to do so on every occasion that it sampled since October 29, 2009.  Finally, based on its review of publicly available documents, CSPA is informed and believes that Trical has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including Biological Oxygen Demand, Chemical Oxygen Demand, Phosphates, Ammonia, Hydrobromic Acid, Picric Acid, 1,3-dichloropropene, Chlorine, Sodium Hypochlorite and any adhesives, emulsifiers, fumigants and waste engine oil.

Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, Trical is subject to penalties for violations of the General Permit and the Act since October 29, 2009.  These violations are set forth in greater detail below.

**1.     Trical Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events During Three of The Last Five Wet Seasons, and Has Failed to Sample from All Required Discharge Points.**

Based on its review of publicly available documents, CSPA is informed and believes that Trical has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during four of the past five Wet Seasons, as required by the General Permit.  This is so, even though there were many qualifying storm events from which to sample (discussed further below).

In four of the past five Wet Seasons, Trical reported that the Facility did not sample the first qualifying storm event of the season in violation of the General Permit, each time claiming that the first qualifying storm event occurred outside of scheduled facility operating hours. However, based upon its review of publicly available rainfall data, CSPA is informed and believes that this cannot be true.

Further, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than the four sampling points currently designated by Trical.  These failures to adequately monitor storm water discharges constitute separate and ongoing violations of the General Permit and the Act.

Notice of Violation and Intent To File Suit
October 29, 2014
Page 13 of 19

> **2.      Trical Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." General Permit, Section B(4)(a). As evidenced by the entries on Form 4 Monthly Visual Observations contained in Trical's Annual Reports for five of the last five Wet Seasons, CSPA is informed and believes that Trical has failed to comply with this requirement of the General Permit.

Specifically, Trical failed to conduct monthly visual observations of discharges from qualifying storm events for all months during five of the past five Wet Seasons as required by the General Permit. Instead, Trical either completely failed to document visual observations at all, or documented its visual observations of storm water that discharged during non-qualifying storm events during five of the past five Wet Seasons. However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Trical could have observed.

For example, Trical reported in its 2009-2010 Annual Report that, except for the month of May, it did not observe a discharge or there was no rain during the entire Wet Season. Based on its investigation of publicly available rainfall data, CSPA is informed and believes that this could not be possible because there were numerous significant rainfall events during those months. *See* Attachment A. Trical's failure to conduct this required monthly Wet Season visual monitoring extends back to at least October 29, 2009, and has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

> **3.      Trical's Failure to Analyze Storm Water Samples for All Required Constituents.**

Trical has failed to analyze storm water samples for all required constituents. Specifically, it has failed to ever analyze samples for Iron, Nitrate + Nitrite Nitrogen, Lead, Zinc, and Phosphorous, as required for facilities enrolled under SIC Codes 2879. *See* General Permit, Section B(5)(c)(iii) and Table D, Section N. It has failed to do so on every occasion that it sampled since October 29, 2009. In addition, CSPA is informed and believes that Trical has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including Biological Oxygen Demand, Chemical Oxygen Demand, Phosphates, Ammonia, Hydrobromic Acid, Picric Acid, 1,3-dichloropropene, Chlorine, Sodium Hypochlorite and any adhesives, emulsifiers, fumigants and waste engine oil. Each failure to sample for all required constituents is a separate and distinct violation of the General Permit and Clean Water Act. Accordingly, Trical is subject to penalties for these violations of the General Permit and the Act since October 29, 2009.

### C.    Trical Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigations, and the Facility's exceedances of EPA benchmarks explained above, indicate that Trical has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Specific Conductance, Oil and Grease, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, Trical must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Trical must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  Trical has failed to adequately implement such measures.

Trical was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, Trical has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  Trical is subject to penalties for violations of the General Permit and the Act occurring since October 29, 2009.

### D.    Trical Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and

their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that Trical has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Trical has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Trical has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  Trical is subject to penalties for violations of the General Permit and the Act occurring since October 29, 2009.

**E.      Trical Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Trical is discharging elevated levels of Total Suspended Solids, Specific Conductance, Oil and Grease, and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedences, Trical was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Trical was aware of high levels of these pollutants long before October 29, 2009.  Trical has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since October 29, 2009, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  Trical is subject to penalties for violations of the General Permit and the Act occurring since October 29, 2009.

**F.**      **Trical Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigations indicate that Trical has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, Trical reported in three Annual Reports filed for the past five Wet Seasons (i.e., 2009-2010, 2010-2011, 2011-2012) that it did not observe storm water discharges occurring during the first storm of those Wet Seasons, in violation of the permit.

Further, Trical failed to sample from qualifying storm events in four out of last five Wet Seasons in violation of the permit.  Trical also failed to comply with the monthly visual observations of storm water discharges requirement for five of the past five Annual Reports filed for the Facility.  For example, in the 2009-2010 Annual Report,

Notice of Violation and Intent To File Suit
October 29, 2014
Page 17 of 19

Trical did not observe discharge from any qualifying storm events except in the month of May, even though there were numerous qualifying storm events to observe.

These are but a few examples of how Trical has failed to file completely true and accurate reports.  As indicated above,  Trical has failed to comply with the Permit and the Act consistently for the past five years; therefore, Trical has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Trical submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years.  Trical's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Trical is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since October 29, 2009.

**IV.     Persons Responsible for the Violations.**

CSPA puts Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation on formal notice that it intends to include those persons in this action.

**V.      Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
John J. Prager
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

Notice of Violation and Intent To File Suit
October 29, 2014
Page 18 of 19

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Trical, Inc., Dean C. Storkan, John Ivancovich and Trical Soil Fumigation and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

Notice of Violation and Intent To File Suit
October 29, 2014
Page 19 of 19

## <u>SERVICE LIST</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, Trical, Inc., et al**
**Significant Rain Events,* October 29, 2009 – October 29, 2014**

|  |  |  |  |
|---|---|---|---|
|  | April 20, 2010 | October 6, 2011 | December 26, 2012 |
|  | November 24, 2010 | November 3, 2011 | December 29, 2012 |
|  | November 25, 2010 | November 5, 2011 | January 5, 2013 |
|  | November 27, 2010 | November 6, 2011 | January 6, 2013 |
| December 7, 2009 | December 5, 2010 | November 11, 2011 | February 19, 2013 |
| December 10, 2009 | December 15, 2010 | November 19, 2011 | March 6, 2013 |
| December 11, 2009 | December 22, 2010 | November 20, 2011 | January 6, 2014 |
| December 12, 2009 | December 26, 2010 | January 20, 2012 | February 2, 2014 |
| December 13, 2009 | December 27, 2010 | January 21, 2012 | February 6, 2014 |
| December 26, 2009 | December 28, 2010 | February 13, 2012 | February 7, 2014 |
| December 27, 2009 | December 29, 2010 | February 15, 2012 | February 8, 2014 |
| January 12, 2010 | January 1, 2011 | February 29, 2012 | February 9, 2014 |
| January 13, 2010 | January 2, 2011 | March 16, 2012 | February 26, 2014 |
| January 17, 2010 | January 3, 2011 | March 17, 2012 | February 28, 2014 |
| January 18, 2010 | January 4, 2011 | March 24, 2012 | March 1, 2014 |
| January 19, 2010 | January 30, 2011 | March 25, 2012 | March 6, 2014 |
| January 20, 2010 | January 31, 2011 | March 27, 2012 | March 26, 2014 |
| January 21, 2010 | February 15, 2011 | March 28, 2012 | March 27, 2014 |
| January 22, 2010 | February 16, 2011 | March 31, 2012 | March 29, 2014 |
| January 23, 2010 | February 17, 2011 | April 10, 2012 | March 31, 2014 |
| January 26, 2010 | February 18, 2011 | April 11, 2012 | April 1, 2014 |
| January 29, 2010 | February 19, 2011 | April 12, 2012 | April 25, 2014 |
| February 4, 2010 | February 24, 2011 | April 13, 2012 | September 25, 2014 |
| February 5, 2010 | February 25, 2011 | April 25, 2012 | October 15, 2014 |
| February 9, 2010 | March 6, 2011 | April 26, 2012 | October 25, 2014 |
| February 21, 2010 | March 16, 2011 | June 4, 2012 |  |
| February 23, 2010 | March 18, 2011 | October 29, 2012 |  |
| February 24, 2010 | March 19, 2011 | November 11, 2012 |  |
| February 26, 2010 | March 20, 2011 | November 16, 2012 |  |
| February 27, 2010 | March 21, 2011 | November 17, 2012 |  |
| March 2, 2010 | March 23, 2011 | November 18, 2012 |  |
| March 3, 2010 | March 24, 2011 | November 21, 2012 |  |
| March 10, 2010 | March 25, 2011 | November 28, 2012 |  |
| March 12, 2010 | March 26, 2011 | November 30, 2012 |  |
| March 30, 2010 | April 21, 2011 | December 1, 2012 |  |
| March 31, 2010 | May 15, 2011 | December 2, 2012 |  |
| April 2, 2010 | May 16, 2011 | December 3, 2012 |  |
| April 4, 2010 | May 17, 2011 | December 14, 2012 |  |
| April 5, 2010 | May 25, 2011 | December 19, 2012 |  |
| April 11, 2010 | June 4, 2011 | December 22, 2012 |  |
| April 12, 2010 | June 28, 2011 | December 23, 2012 |  |
| April 13, 2010 | October 5, 2011 | December 25, 2012 |  |

* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.